UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 06-10213-RWZ

UNITED STATES OF AMERICA

v.

CLARENCE ANDRADE

ORDER ON PRETRIAL MOTION

May 18, 2007

ZOBEL, D.J.

Defendant, Clarence Andrade ("Andrade"), stands indicted on one count of possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1).  He has moved to suppress evidence resulting from a police stop and search.  (Docket # 21.)  Based on the parties' motion papers and after an evidentiary hearing, I find the following facts and deny defendant's motion to suppress.

I.      **Findings of Fact**

   A.      **The Emergency 911 Call**

At 2:25 p.m. on Sunday, January 22, 2006, a New Bedford, Massachusetts, police operator received an emergency 911 telephone call from a male caller.  The caller, told by the operator he was on a recorded line, reported that "[t]hree guys [are] looking to start with some other guy outside on the street here."  (911 Call Tr., Jan 22, 2006 (Docket # 27, Attach. 2, Ex. B).)  The operator, who had a caller ID display showing the name and address associated with the calling telephone number, asked:

"Where is that?  Where are you at?  37 Madison?," to which the caller replied "Yup."

(Id.)  He proceeded to tell the operator that there were "three guys, one looks to be

Latino or something, . . . just threatened the other guy, saying I'll come back and shoot

you or kill you or whatever" and identified the individual being threatened as "liv[ing]

here . . . on the third floor."  (Id.)  Finally, he described the men and the direction in

which he saw them leaving: "they all got hooded sweatshirts: a white, a gray and a

black," and ". . . the three guys now, they're walking south on [what] looks like Pleasant

Street."  (Id.)

Sergeant John T. Catterall ("Catterall"), the New Bedford patrol supervisor at the

time, received a textual report of the call on a mobile data computer in his cruiser.

(Catterall Aff. ¶ 4 (Docket # 27, Attach. 1).)  This report identified the caller as the first-

floor tenant at 37 Madison Street and the potential victim as living on the third floor.

(Id.)  He proceeded to 37 Madison Street, notified dispatch that he did not see the

suspects there, then got out of his car to locate the caller.  (Id. ¶ 9.)  Just before he

began to interview the first-floor tenant, Catterall heard over his walkie-talkie that

another officer had stopped some males at Russell and Purchase Streets.  (Hr'g Tr.

78:16-80:5, 114:19-22, Mar. 20, 2007 (Docket # 33).)  The first-floor tenant, Jason

Alcock ("Alcock"), who shared a last name and residence with the registered owner of

the telephone account, acknowledged that he had made the 911 call.  (Catterall Aff. ¶¶

10, 18.)  Following his conversation with Alcock, Catterall interviewed Ernie Souza

("Souza"), the third-floor tenant at 37 Madison.  (Id. 81:19-23.)

As it turned out, Alcock had related the facts of the interaction incorrectly to the

2

911 operator.  The individuals had not threatened to shoot the third-floor tenant, rather the third-floor tenant had been lighting firecrackers and the three men stopped to admonish him.  (Id. 82:5-12.)  They "yell[ed] to him that it wasn't smart for him to light firecrackers when there was a shooting nearby earlier that morning."  (Catterall Aff. ¶ 11.)  Souza stated that "no one mentioned shooting anyone."  (Id.)  After an unfriendly exchange of words, the men walked off.  (Id.)

### B.    The Arresting Officer's Knowledge and Actions

Prior to the 911 call just described, shortly after midnight on the same day, New Bedford police had received numerous reports of shots fired.  (Id. ¶ 2.)  The police responded and recovered approximately a dozen spent casings from the area of Purchase Street and Madison Street.  (Id.)  About an hour later, two men with non-life threatening gunshot wounds arrived at St. Luke's Hospital.  They admitted to being in the area, but provided no further information.  (Id.)  A police lieutenant prepared a memo detailing these facts and distributed it at 3:08 a.m. by email to, inter alia, Officer Gary Sarmento ("Sarmento").  Police email records indicate Sarmento opened the memo at 10:30 that morning, and he testified that he read it prior to encountering defendant that day.[1]  (Sarmento Aff. ¶ 3 (Docket # 27, Attach. 2); Hr'g Tr. 8:13-9:4, Mar 21, 2007 (Docket # 34); see also Docket # 27, Attach. 2, Ex. A.)  Number 37 Madison Street is located one house away from the intersection of Madison and Purchase

---

[1] There are no allegations that defendant Andrade had any involvement in the early morning shooting.  These facts are relevant only to establish Sarmento's state of mind and evaluate whether he had reasonable suspicion to stop and question Andrade later that afternoon.

Streets.  (Catterall Aff. ¶ 5.)

Sarmento is an experienced officer who has been involved in numerous criminal investigations, including investigations of shootings and gang activity.  (Sarmento Aff. ¶ 2.)  At the March 2007 hearing, he testified that he has been a New Bedford policeman for 15 years; for the last 18 months he has been assigned to the community policing unit.  (Id. ¶ 1.)  Sarmento described the area around Madison and Purchase Streets in downtown New Bedford as "a high crime area that is inhabited by, among others, youths involved in gang activity and is an area where, in [his] experience multiple shootings have occurred."  (Id. ¶ 2.)

In mid-afternoon of the day of the shootings, Sarmento was on uniformed patrol in a marked police car in downtown New Bedford.  (Id. ¶ 3.)  He was aware that no one had been arrested or identified for the earlier shootings.  (Id.)  At approximately 2:37 p.m., he heard a radio dispatch advising that "a complainant on the first floor" of 37 Madison Street reported:

> . . . some males were arguing with a party that lives on the third floor here, and they threatened to come back and shoot the party.  [T]hey are going to be three males, all had hooded sweatshirts, uh, black, gray and white in color.  Left south on Pleasant Street on foot.[2]

(Dispatch Call Tr., Jan 22, 2006, 14:32:01 (Docket # 27, Attach. 2, Ex. B).)  Sarmento confirmed with the dispatcher that the males were "walking south on Pleasant from Madison" and reported that he was in the area.  (Id.)  He turned east onto Russell

---

[2] Sarmento testified that his police car was not equipped with a mobile data computer, so he did not receive the text message of the 911 call.  (Hr'g Tr. 8:2-6, Mar. 21, 2007.)  Information he received that afternoon was via voice radio transmissions from the police dispatcher and from other officers.

Street, one block west of Pleasant Street.  Russell Street runs one block south of and parallel to Madison Street and perpendicular to Pleasant Street.  (<u>See</u> Sarmento Aff., Ex. D.)  He did not see anyone as he crossed Pleasant Street, however, three houses down, at the next intersection, he observed four men and a woman walking south down Purchase Street (Sarmento Aff. ¶ 6.)  Three of the men were clad in a black, a gray and a white hooded sweatshirt respectively.  (<u>Id.</u>)  Approximately fifteen seconds after Catterall radioed that he was going to try and locate the caller at 37 Madison Street, Sarmento reported to dispatch that he "[had] those males at, uh, Russell and Purchase."  (Dispatch Call Tr., Jan 22, 2006, 14:35:42.)

Sarmento pulled over, got out of his car and told the group to stop.  (Sarmento Aff. ¶¶ 7-9.)  Four of the individuals complied, but defendant continued forward.  Sarmento put out his arm to block defendant and again ordered him to stop.  (<u>Id.</u>)  Defendant continued forward, walked into Sarmento's arm, refused to make eye contact and looked around "as if he was looking for a direction in which to flee."  (Hr'g Tr. 17:22-18:14, 19:6-10, Mar. 21, 2007.)  Sarmento observed that defendant and another male had their hands hidden in the front pockets of their sweatshirts.  (Sarmento Aff. ¶¶ 7-8.)  He also recognized one of the group, the male in the black hooded sweatshirt, as having a criminal history and as having been involved in "violent gang related activity." (<u>Id.</u> ¶ 11.)  Sarmento then "grabbed Andrade by the sweatshirt and held him against the trunk of the cruiser bent over by the waist."  (<u>Id.</u> ¶ 9.)  He did the same to the second male who also had his hands hidden in his sweatshirt.  (<u>Id.</u> ¶ 12.)  Sarmento testified that he was concerned that the men might be armed and that he felt in danger.  (Hr'g

Tr. 20:4-22, Mar. 21, 2007.)

Sarmento asked another officer, just arriving on the scene, to take control of the second male and turned his attention to defendant, intending to frisk him for weapons. (Id. 22:2-8.)  Looking down, he saw "the handle of the firearm in [defendant's] waistband." (Id. 22:11:13.)  The firearm was visible because the sweatshirt had bunched up around the back of defendant's neck and been pulled up above his waist when Sarmento put him over the trunk of the cruiser.  (Id. 22:14-24:14.)

Sarmento placed defendant on the sidewalk, handcuffed him, and began to search him further.  (Sarmento Aff. ¶ 14.)  He discovered a second handgun along with a baggie containing several rounds of ammunition.  (Id.)  He then arrested defendant. (Id.)

The transcribed radio transmissions show one and one-half minutes elapsed between Sarmento's announcement that he spotted the group and another officer, Kurtis Gonsalves ("Gonsalves"), calling for additional police officers and sending a garbled transmission concerning a "firearm." (Id., Ex. B., 14:37:17.)  The total time between Catterall's transmission that he was "gonna try to locate that caller [at 37 Madison Street]" and Gonsalves' transmission concerning a "firearm" was approximately two minutes.  (Id.)

## II.    Discussion

### A.    Motion to Suppress Evidence Seized

Andrade now moves to suppress the two guns and the ammunition seized on the ground that the officers had neither reasonable suspicion nor probable cause to stop

and search him.  (Docket # 21.)  In particular, he argues that information received from

the "anonymous" 911 caller cannot establish adequate reasonable suspicion to justify

the stop by Sarmento.  (See Docket # 22, 4-7.)  The government argues that the totality

of circumstances leading up to the arrest sufficiently established reasonable suspicion

for a brief, investigative stop and a pat-frisk for weapons.  (See Docket # 27.)

### B.    Legal Standard

"An officer may conduct a brief investigatory stop when he or she has a

reasonable, articulable suspicion that criminal activity is afoot."  United States v.

McKoy, 428 F.3d 38, 39 (1st Cir. 2005) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968);

United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004)).  Reasonable suspicion must

be based on an objective analysis of  "specific and articulable facts."  United States v.

Hensley, 469 U.S. 221, 226 (1984) (internal citations omitted).  "[A] court looks at the

totality of the circumstances to see whether the officer had a particularized, objective

basis for his or her suspicion."  McKoy, 428 F.3d at 39.  These circumstances are

viewed "through the eyes of a reasonable and cautious police officer on the scene,

guided by his experience and training."  United States v. Bayless, 201 F.3d 116, 133

(2d Cir. 2000).

After a valid Terry stop, the officer may conduct a pat-frisk for weapons if "the

officer is justified in believing the person is armed and dangerous to the officer or

others."  Romain, 393 F.3d at 71 (quoting United States v. Schiavo, 29 F.3d 6, 8 (1st

Cir. 1994)); accord Terry, 392 U.S. at 27 (noting that the search for weapons is

warranted for the protection of the police officer "regardless of whether he has probable

cause to arrest the individual for a crime."). However, the justification for the pat-frisk

must be analyzed separately from the justification for the stop itself. McKoy, 428 F.3d

at 39.


C.      Analysis

        1.      Reasonable Suspicion Justifying the Police Stop

Defendant argues that an anonymous call to police cannot support a Terry stop,

relying on Florida v. J.L., 529 U.S. 266 (2000). J.L. held that an anonymous tip that a

particular individual was carrying a gun, without more, is insufficient to justify a stop

and frisk of that individual. Id. at 268. However, here the 911 caller was not truly

anonymous, and thus this case does not raise the concern of the Court in J.L. that "any

person seeking to harass another [by] an intrusive, embarrassing police search of the

targeted person" could simply place an anonymous false call to police. Id. at 272. In

J.L., the Court recognized the difference between an anonymous tip and a tip from an

informant "who can be held responsible if her allegations turn out to be fabricated." Id.

at 270. In this case, Alcock did not hide his identity. He knew that the call was being

recorded and that the 911 operator had identified his location as 37 Madison Street.

He further described the victim as "liv[ing] here . . . on the third floor." In addition,

unlike the caller in J.L., Alcock was reporting his first-hand impressions of transpiring

events concerning imminent criminal activity which presented an immediate danger to

the community. See Illinois v. Gates, 462 U.S. 213, 238 (1983) (reaffirming the

totality-of-the-circumstances analysis of anonymous tips and noting that the Fourth

8

Amendment does not require "a standard that leaves virtually no place for anonymous citizen informants."). Moreover, unlike the situation in J.L., the officer here had other facts to support his stop and search beyond "a call made from an unknown location by an unknown caller." Id. at 270.

Sarmento was an experienced police officer and was familiar with gang activity in New Bedford. He was also aware that the Madison/Purchase Street area was a high-crime area and that two individuals had been shot in that vicinity approximately fourteen hours earlier. At the time of this incident, no suspects had been identified in that shooting. Sarmento was responding to a radio dispatch warning that a few minutes earlier "some males . . . threatened to come back and shoot [another] party [at 37 Madison Street.]" Finally, he observed a group of five individuals less than a block away from the site of the reported threat and one street over from and walking in the direction described by the dispatch call. Three of the five individuals were wearing hooded sweatshirts matching the description of the three males described in the dispatch call. Taken together, these facts provided the officer with a reasonable suspicion of criminal activity that justified further investigation. Cf. United States v. Velez-Saldana, 252 F.3d 49, 52 (1st Cir. 2001) (finding reasonable suspicion to support a stop even though "[a]ll the police had was a criminal incident, an isolated location, an unfamiliar face, and a coincidence of time and location").

The fact that the 911 caller reported the incident incorrectly, and that the trio had not threatened to come back and shoot anyone, does not change this result. At the time Sarmento stopped the group, the information given to him was that threats had

9

been made.[3]  The analysis of whether the stop was justified considers "whether the

officer had a particularized, objective basis for his or her suspicion" based on the facts

known to him or her at the time.  McKoy, 428 F.3d at 39; accord United States v. Aitoro,

446 F.3d 246, 253 (1st Cir. 2006) ("The reasonableness of a search entails an

objective inquiry into the search from the perspective of the searching officers . . . .").

Thus, Sarmento's decision to stop and investigate was objectively reasonable.

### 2.    Legality of the Pat-Down Frisk

Once Sarmento had ordered the group to stop, additional facts provided a

reasonable basis for his decision to frisk defendant.  See McKoy, 428 F.3d at 39

(noting that the officer must have a separate particularized, objective basis for

"believing that the person is armed and dangerous to the officer or others" to support a

protective frisk).  First, he recognized one of the five individuals and knew him as

having been involved in violent gang activity.  Next, defendant ignored two orders to

stop and he continued walking, running into the officer's arm.  In addition, defendant

---

[3] Defendant argues that once Catterall discovered that the information provided by the 911 caller was false, a "collective knowledge" doctrine imputed the "knowledge of one officer to another" and the stop was no longer justified.  (Docket # 31, 5 (citing generally United States v. Hensley, 469 U.S. 221 (1985).)  This is too broad a reading of Hensley.  That case merely held that the Fourth Amendment does not prevent police in other jurisdictions from relying on flyers or bulletins in making stops to investigate past crimes.  Hensley, 469 U.S. at 232.  Indeed, the Court noted that the governmental interests and the nature of the intrusions involved in the investigation of past crime differ from the investigation of a suspect for an ongoing crime because of the lack of "exigent circumstances which require a police officer to step in before a crime is committed or completed."  Id. at 228 (emphasis added).  In any event, the timetable of the transcribed radio transmission makes clear that the firearms in the instant case were discovered before or as Catterall's interviews of the tenants at 37 Madison Street revealed the true nature of the interaction with the group of three males.

refused to make eye contact and looked around as if to flee.[4]   Finally, defendant's

hands were not in sight and he could have been concealing a weapon in his pockets.

Sarmento testified that he was outnumbered and felt in danger when he made the

decision to secure defendant and the second male against the trunk of his cruiser in

order to check them for weapons.

These factors are at least as compelling as the actions justifying the pat-frisk in

Terry.  See 392 U.S. at 6 (finding a pat-frisk for weapons justified when the officer

confronted three men observed walking past a store a dozen times while conferring

with each other in what the officer suspected was "casing a job, a stick-up"); see also

United States v. Romain, 383 F.3d 63 (1st Cir. 2004) (finding a pat-frisk justified where

a 911 caller reported an armed man, the police identified the caller and the man

identified in the call exhibited "frenetic behavior").  Given the circumstances, "a

reasonably prudent man in the circumstances would be warranted in the belief that his

safety or that of others was in danger."  Terry, 392 U.S. at 27.

Defendant argues that, even if a Terry pat-down frisk was justified, Sarmento

actually conducted a more intrusive search, requiring more than merely reasonable

suspicion, by lifting defendant's sweatshirt to find the gun.  (Docket # 31, 2.)  He cites

Sarmento's police report of the incident wherein he stated, "I lifted the front of his

sweatshirt," as well as the report of a second officer describing the suspects as

---

[4] Sarmento also testified that he recognized defendant's face from a wanted poster he had seen previously.  (Hr'g Tr. 29:15-30:6, Mar. 21, 2007.)  The government was unable to produce the wanted poster and there is a dispute between the parties as to its relevance in justifying the stop.  Because there were other adequate objective facts to justify the stop and frisk, I do not address the issue of the wanted poster here.

"searched," not frisked.  (Id. at 5.)  Sarmento testified at the hearing that his report
refers to his observation of the gun in defendant's waist when the sweatshirt bunched
up as he held him over the trunk of the cruiser.  During the hearing, defense counsel
donned the sweatshirt worn by defendant on January 22, 2006, and asked Sarmento to
demonstrate how he held defendant on that date.  As Sarmento pushed counsel over a
simulated trunk, the sweatshirt rode up to clearly reveal counsel's waist.  I accept
Officer Sarmento's testimony because I find the witness to be credible and the
demonstration was in accordance with this testimony.

The second officer, Michael Oliver ("Oliver"), also testified at the hearing.  At the
time of defendant's arrest, he had been a police officer for one year, and this incident
was the first time he had been involved in an arrest of a suspect with weapons.  (Hr'g
Tr. 14:7-14, Apr. 3, 2007 (Docket # 35).)  Although Oliver's report referred to a
"search," he testified that he only conducted a Terry pat-frisk of one of the suspects.
(Id. 22:3-10, 17:19-18:8.)  Oliver also testified that he was focused on this suspect and
did not observe what Sarmento was doing until he heard a warning about a gun.  (Id.
18:18-19:13.)   I credit Oliver's testimony and conclude that his use of the word
"searched" in his report does not properly describe his or Sarmento's actions.

## III.    Conclusion

 Under the totality of the circumstances -- the information Officer Sarmento
received from dispatch of a threatened shooting, his knowledge of the general level of
gang activity in the neighborhood, his experience as a police officer and the recent
shooting near the same address -- I find he had a reasonable, articulable suspicion that

defendant was involved in the reported altercation at 37 Madison Street and that he

might be armed, which justified stopping him and frisking him for weapons.

Accordingly, defendant's motion to suppress (Docket # 21) is DENIED.


    May 18, 2007                          /s/Rya W. Zobel
         DATE                           RYA W. ZOBEL
                                  UNITED STATES DISTRICT JUDGE